NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DANIEL O'HARE, | : | Hon. Joseph H. Rodriguez |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 08-2083 |
| v. | : | |
| | : | |
| MCLEAN PACKAGING AND TRUCKING, | : | |
| | : | Opinion |
| Defendant. | : | |

Presently before the Court is a motion for summary judgment filed by Defendant McLean Packaging and Trucking ("McLean") pursuant to Fed.R.Civ.P. 56. Counts I and II of the Complaint filed by Plaintiff Daniel O'Hare ("O'Hare") claim violations of the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 et seq in the form of interference and retaliation, respectively. Counts II and IV of the Complaint allege violations of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. in the form of handicap discrimination and perceived handicap discrimination, respectively. The Court has considered the written submissions of the parties and heard oral argument on the motion September 21, 2009. For the reasons set forth here, and on the record during oral argument, Defendants' motion is granted in part and denied in part.

### I. Background

O'Hare began his employment with McLean on January 31, 2005 as a shipping manager. Deposition of David Seidenberg ("Seidenberg Dep."), Ex. A., pp. 12-13. McLean is a privately owned and operated business that manufactures and sells

1

packaging products.  McLean Employee Handbook, Ex. B., pp. 3,4.  During his tenure at McLean, O'Hare worked exclusively in the shipping department and was responsible for ensuring that shipments went out properly and was also responsible for performing certain warehouse functions.  Deposition of Daniel O'Hare ("O'Hare Dep."), Ex. C., pp. 16, 20, 22-23.  O'Hare was also the supervisor of two Union employees: Chris Coyle and Bob Langford.  Id. at pp. 25, 27.  On April 4, 2008, O'Hare was advised that he was being "laid off" because of McLean's financial decline.  Id. at p. 133.

During O'Hare's employment, he took four leaves of absences for medical reasons, which provide the basis for his Complaint.[1]  O'Hare insists that he was laid off in retaliation for taking the leaves of absence and claims that McLean also interfered with his rights under the Family Medical Leave Act.  McLean, however, contends that during the course of O'Hare's employment, it suffered a decrease in its business which drastically slowed down the volume of work at the plant.  As a result, McLean was forced to implement a reduction in force program whereby it systematically laid off at least ten employees during the February 2008- April 2008 period.  Seidenberg Dep., Ex. A., pp. 54-56; Employment History, Ex. O.  This is the nondiscriminatory reason given for O'Hare's termination.[2]

_____Given O'Hare's assessment of his periods of leave as occuring four distinct times,

---

[1]The number of periods of leave is disputed and to some extent run together.  It appears from the record that McLean did not keep, or did not provide, any company leave records, contributing to the dispute over O'Hare's absences.

[2]It is undisputed that O'Hare was not given the option to return and his employment ended.  McLean states that O'Hare's position was eliminated, obviating the need to call him back from a lay-off.

it is helpful to review the facts of each period of leave separately.  But first, a review of

the contents McLean's employee handbook provides the appropriate backdrop for the

facts of this case.

## The McLean Employee Manual/ Handbook

Attached as Exhibit B to McLean's motion is the employee manual, entitled "You

and Your Company McLean Packaging Corp."  On page "18" the section entitled "Leaves

of Absence" begins.  The relevant portion of that section provides:

> Family/Medical/Maternity Leave
>
> In accordance with applicable state and federal laws,
> employees are eligible for up to 12 weeks of unpaid leaves
> from absences due to certain family and medical events.
> Employees must be employed for at least 12 months prior to
> the commencement of the leave, and must provide 30 day
> advance notice of the need to take FMLA leave when the
> need is foreseeable and such notice is practicable.
>
> Leaves taken under the Family and Medical Leave Act are to
> run concurrently with any available paid leave under McLean
> Packaging Corp.'s disability plan.
>
> Medical benefits will be continued for the 12 week leave
> period, subject to any payment by the employee of his/her
> applicable contribution.

McLean Ex. B., Employee Manual, p. 18.

O'Hare admits that he was provided with a copy of the McLean Employee Manual and

that he reviewed it.  O'Hare Dep., Ex. C., pp. 33, 179, 182.  Defendant submits that a

summary of employee rights under the FMLA was posted outside of O'Hare's office at

the plant.  McLean, Ex. D., Answers to Interrogatories.

## O'Hare's First Medical Leave of Absence

On October 28, 2008, O'Hare was hospitalized with symptoms of high fever,

groin pain, and other complications and was ultimately diagnosed with diverticulitis. O'Hare Dep., Ex. C., pp. 40-42, 44, 59.  Following this absence he was diagnosed with a mass in the left lobe of his lungs.  O'Hare Dep., Ex. B., pp. 40-42-44; Report of Dr. Codella, Ex. I.  O'Hare's brother notified McLean of the hospitalization the next day and advised R.J. Howarth (Plaintiff's supervisor and McLean's Plant Manager) that O'Hare would be returning to work on October 29, 2007.  O'Hare Dep., Ex. C., pp. 44-45.

However, the leave of absence endured for nearly a month and O'Hare ultimately resumed his duties at McLean on November 19, 2008, but residual pain forced him to leave early that day.  O'Hare Dep., Ex. B., pp. 59-62; R.J. Howarth email, Ex. D.  When Plaintiff again returned to work, he was placed in his previous position as a shipping/transportation manager.  O'Hare Dep., Ex. C., p.71.

Although McLean contends it considered this period of leave as medical leave under its Leave of Absence and Illness Policies, see Deposition of R.J. Howarth ("Howarth Dep."), Ex. E., p. 22, O'Hare testified in deposition that he never received any individualized notification of his rights under either the company's policy and/or the FMLA.  O'Hare Dep., Ex. C., p. 175.  O'Hare did not inquire about his rights, but he was fully paid during his absences.  Id. at 61, 62.  The parties agree that the leave period began on October 28, 2007.  The end of the period is contested; Plaintiff calculates the end date as November 17, 2007, while Defendant argues the end of the period is November 26, 2007.[3]

---

[3]In addition, after the conclusion of this leave period, McLean states that Plaintiff took a number of vacations days during the Christmas/New Year Holidays.  Compare O'Hare Dep., Ex. C., pp. 72-73.  O'Hare disputes this as will be further discussed in the section entitled Third Leave of Absence, infra.

**O'Hare's Second Leave of Absence**

O'Hare argues that the second leave period consists of the time between his return to work on November 19, 2007 (and had to leave early)and his following return after the Thanksgiving Holiday on November 26, 2007. The record is devoid of any formal attendance records for O'Hare, with the exception of a few emails that piece together some absences. According to O'Hare, this leave of absence was for approximately one week. McLean disputes this calculation, instead lumping this week into the "First Leave of Absence".

**Third Leave of Absence**

O'Hare testified that he did not work through the month of December, as suggested by McLean. Thus this period of time spanning November 27, 2007 through the first week of January 2008 is labeled by O'Hare as his third leave of absence from the company. In support, O'Hare submits an email from Howarth to Jeff Besnick, Seidenberg, and Gutstein, which states that O'Hare will be returning to work on Monday December 26, 2007 (Ex. K.), and his own deposition testimony in which he states that he requested the application of vacation days to extend the holidays of Christmas and New Year's (Ex. B. at pp. 72-73). Plaintiff calculates this leave period as lasting approximately one month.

**Fourth Leave of Absence**

During the second week of January 2008, O'Hare developed a Clostridium difficile infection, commonly referred to as a C.Diff infection[4], requiring more time off

---

[4] A C.Diff infection is a complication of diverticulitis.

5

from work until approximately January 28, 2008. Plaintiff labels this period of leave as his Fourth leave of absence; Defendant claims this is the Second leave of absence. Plaintiff supplies a series of emails which, taken together, memorialize O'Hare's absences during this time.

O'Hare returned to work with some restrictions including that he avoid heavy lifting and/or operate a forklift. O'Hare Dep. Ex. C., pp. 94-96. According to Howarth, however, O'Hare's restrictions were dietary. Howarth Dep., Ex. E. at p. 21. And in March 2008, O'Hare again resumed operating the forklift and performing heavy lifting. O'Hare Dep., Ex. C., p. 123. By April 2008, he was performing his duties without any restrictions. Id. at 124-125.

O'Hare contends that during his various leaves of absences he was never informed of his rights pursuant to the FMLA and that he was continuously concerned about his employment being terminated due to his excessive absences. O'Hare Dep., Ex. B. at pp. 81-82; 94; 98. He also states that he kept McLean management informed of his illnesses, and the concomitant restrictions, at all times. Id. at 75 (informing Maureen Shosky); at 76 (informing Howarth); at 104-105 (informing Fenkel).

**McLean's Business Conditions During O'Hare's Absences**

The record demonstrates that McLean experienced a steady decrease in its business and economic conditions during 2007 that persisted into and through 2008. Dep. of Joseph Fenkel, Ex. K., pp. 37, 44. McLean identifies a series of occurrences that contributed to the downturn which include a loss of a major account, increased operational costs, and a decrease in business. Id. McLean submits two Statements of Income and Retained Earnings for the years 2007 and 2008. For the year ending May

31, 2007, McLean's net income totaled $2,013,303.00.  McLean 2007 Statement, Ex. I.

The following year in 2008 saw a decrease of nearly $1,500,000.00 resulting in a net

income of $549,747.00 for that year.  McLean 2008 Statement, Ex. J.

Several McLean employees and managers provided deposition testimony related

to the slow conditions of the plant during the relevant period of time.  See, e.g.,

Deposition of Dannette Gudaitus ("Gudaitus Dep."), Ex. H.; Deposition of Vince Niroda

("Niroda Dep."), Ex. L.; Deposition of Dennis Charbonneau ("Charbonneau Dep."), Ex.

M.  According to McLean, these economic factors forced it to implement a reduction in

force ("RIF") program that resulted in the systematic layoffs of several employees and

managers, including O'Hare.  McLean submits a chart detailing the employees affected

by the RIF that is depicted as follows[5]:

| EMPLOYEE | POSITION | DATE OF LAYOFF |
|---|---|---|
| Andrew Howard | Cutting; Material Handler | February 22, 2008 |
| Saysana Lokaphone | General plant worker | February 27, 2008 |
| Donna Barron | Packer | April 3, 2008 |
| Ramona Diaz | Packer | April 3, 2008 |
| Joanne Fleckenstein | Packer | April 3, 2008 |
| Edward Omidanski | Packer | April 3, 2008 |
| Chris Coyle | Forklift Shipping Dept. | April 11, 2008 |
| Filiberto Melgar | Maintenance | April 15, 2008 |

---

[5] McLean's Mot. For Summ. Judg., p. 11.  In addition to those listed in the chart, Printing
Manager Dennis Charbonneau was laid off following O'Hare's termination some time in June,
2008.  Charbonneau Dep., Ex. M. at pp.13-14. Vince Niroda, the Screening Manager and
Assistant Plant Manager who took over O'Hare's Shipping Manager responsibilities, was laid off
in January 2009. Deposition of Marilyn Gutstein ("Gutstein Dep."), Ex. P, p. 28.

| Deborah Blake | Packer | April 30, 2008 |
| Sandra Rainey | Packer | April 30, 2008 |

In deposition, O'Hare agrees that McLean's business was slowing, but he maintains that he was terminated in retaliation for his absences. In support of this contention, he identifies the following facts. Upon his return from the fourth leave of absence, he was asked to train his soon-to-be "replacement"- a fact confirmed by Howarth.[6] Howarth Dep., Ex. L. p. 24. In addition, the temporal proximity of O'Hare's termination to his final medical leave of absence is suspicious at only two months time. Also, following his termination, O'Hare was replaced by Vince Niroda, who was allegedly unqualified yet commanded a salary $45,000.00 in excess of O'Hare's salary, undermining McLean's claim of economic hardship. Compare O'Hare's Ex. A. (email detailing his salary) with Niroda Dep., Ex. H., pp. 35-36. O'Hare further claims that McLean was unable to produce any documents specifically identifying the criteria used to implement the RIF and that McLean was unable to pinpoint a date upon which it was determined that O'Hare would be affected by the RIF. Finally, O'Hare was not laid off; he was terminated. For all of these reasons, and for the reasons that will be discussed in further detail infra., O'Hare claims that summary judgment is unwarranted and opposes McLean's motion seeking the same.

## II. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if,

---

[6]Plaintiff contends that he was replaced by Vince Niroda. McLean acknowledges that Vince Niroda assumed O'Hare's duties, while still maintaining his own duties. McLean contends that it never hired anyone to fill the shipping manager position because the position ceased to exist. But it is undisputed that O'Hare trained Vince Niroda.

viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp., 477 U.S. at 322); accord Fed. R. Civ. P. 56(c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l

9

Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v.

Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986). Credibility determinations are the province of the fact finder. Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. Discussion

### A. Counts I and II, Violations of the FMLA

The purposes of the Family Medical Leave Act are to "balance the demands of the

workplace with the needs of families" and "to entitle employees to take reasonable leave

for medical reasons." 29 U.S.C. § 2601(b)(1) and (2). To those ends, the FMLA requires

that "an eligible employee shall be entitled to a total of twelve workweeks of leave during

any twelve month period" if the employee has a "serious health condition that makes the

employee unable to perform the functions of the position of such employee." 29 U.S.C. §

2612(a)(1)(D).

One of O'Hare's claims is that he was not properly notified of his rights under the

FMLA. "To trigger the application of the FMLA, an employee must provide his employer

with notice that leave is necessary." Johnson v. Thru Point, Inc., 160 Fed. Appx. 159,

162 (3d Cir. 2005)(citing 29 C.F.R. § 825.303 and holding that the plaintiff had not put

his employer on notice of his need for health-related leave because he neither advised

his employer of a medical condition nor provided the employer with an opportunity to

discover it). The Code of Federal Regulations states that:

> [a]n employee shall provide at least verbal notice sufficient to make the
> employer aware that the employee needs FMLA-qualifying leave, and the
> anticipated timing and duration of the leave. The employee need not
> expressly assert rights under the FMLA or even mention the FMLA, but may
> only that leave is needed for an expected birth or adoption, for example.

29 C.F.R. § 825.302(c) (2006). But "[t]o trigger the rights guaranteed under the FMLA,

an employee need not actually mention the FMLA by name, 'the critical question is

whether the information imparted to the employer is sufficient to <u>reasonably apprise</u> it

of the employee's request to take time off for a serious health condition.'" <u>Holpp v.</u>

<u>Integrated Commc'ns Corp.</u>, Civ. No. 03-3383, 2005 WL 3479682, at *5 (D.N.J.

December 20, 2005) (quoting <u>Brohm v. JH Props.</u>, 149 F.3d 517, 523 (6th Cir. 1998))

(emphasis added). Moreover, 29 C.F.R. § 825.302(c) requires an employer to "inquire

further of the employee if it is necessary to have more information about whether FMLA

leave is being sought by the employee, and obtain the necessary details of the leave to be

taken." 29 C.F.R. § 825.302(c) (2006). "[I]t is the employer's responsibility to designate

leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the

employee." 29 C.F.R. § 825.208(a).

Pursuant to the FMLA, "[i]t [is] unlawful for any employer to interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided under this

subchapter." 29 U.S.C. § 2615(a)(1). It follows that the FMLA makes it "unlawful for

any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2) (1993).  But where an employee is discharged during a protected leave for a reason unrelated to the leave, there is no right to reinstatement.  Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004) (citing 29 C.F.R. § 825.216(a)(1)).

### 1. Count I FMLA Interference

In Count I O'Hare alleges interference with his rights under the FMLA factually predicated upon McLean's failure to inform him of its designation of his leave as qualifying under the FMLA and its failure to inform him of his FMLA rights at the times that he requested medical leave.  O'Hare also claims that he was denied permission to take a block of medical leave at the end of January 2008 and was, instead required to call in sick on a daily basis.  To succeed on this interference claim, the Third Circuit requires that O'Hare demonstrate that the failure to advise him of his FMLA rights "rendered him unable to exercise that right in a meaningful way, thereby causing injury."  Conoshenti, 364 F.3d at 143.

Here, McLean does not challenge that it failed to provide O'Hare with the requisite FMLA notice.  Although McLean states that it discussed leave options under the company's policy, it recognized during oral argument that it failed to provide the requisite notification.  Despite this failure, McLean argues that O'Hare cannot point to ensuing injury.  The Court agrees.

During oral argument on the motion, Plaintiff agreed that there was no financial or professional injury resulting from McLean's failure to inform him of his FMLA rights. The only identifiable injury is an alleged denial of his request to take a block of leave of

12

30 days in January 2008. This contention finds no support in the vast record submitted

by Plaintiff and is contradicted by the deposition of Jeff Besnick and the email

confirming the same:

> It was agreed upon that Dan O'Hare will begin using his company benefit
> of one month [at] half pay for medical leave now that he has exhausted his
> one month at full pay. This began using the three days last week (Tues-
> Wed-Fri) and will continue for this full week of 1/21, returning on 1/28.

Besnick email to Gutstein, Ex. G. The explanation by Besnick is consistent with the

McLean leave policy regarding full paid leave and half paid leave. O'Hare exhausted the

full paid leave during his previous absences and acknowledges that he received half paid

leave for this time off. O'Hare dep., Ex. B, pp. 125-128. And although he now claims that

he does not recall any conversation with Besnick regarding the leave pay structure, he

never questioned why his paycheck was half of his normal pay during this absence. Id. at

pp. 128-129.

    Moreover, Plaintiff does not submit any medical or other evidence demonstrating

that the leave he requested was required. [7] Under the FMLA guidelines, Plaintiff was not

obligated to submit this to McLean unless they requested a medical certification[8], but on

a motion for summary judgment, he must come forward with more than his own

unsupported assertion that the leave was necessary and/or that he would have taken

---

[7] Infact, O'Hare was cleared to return to his duties, albeit it with some minor restrictions, by his doctor on January 15, 2008. Id. at pp. 95-96.

[8] The FMLA statute governing medical certification is permissive, vesting the employer with the decision of whether to require a certification. 29 U.S.C. § 2613(a)(employer "may" require a medical certification).

additional leave; he has not done so.[9]  As a result, there is no genuine issue of material fact as to this claim and summary judgment will be granted as to Count I.

### 2. Count II FMLA Retaliation

 In Count II O'Hare alleges that McLean retaliated against him for taking FMLA leave by failing to consider him for another position and ultimately terminating him.[10] In cases alleging retaliation in the employment setting, courts generally apply the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001).  The first step under McDonnell Douglas, is to establish a *prima facie* case of retaliation for requesting FMLA leave. 411 U.S. at 802.  Once a *prima facie* case is established, the burden of persuasion shifts back to the defendant to put forth "a legitimate, nondiscriminatory reason" for the employment decision. Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  If the defendant succeeds in demonstrating that the decision was based on a non-discriminatory reason, Plaintiff has the burden of proving by a preponderance of the evidence that the stated reason was pretextual. Burdine, at 260; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

---

[9] Two unpublished decisions from the Eastern District pf Pennsylvania are persuasive on this point. Voorhees v. Time Warner Cable Nat'l Div., 1999 WL 673062 , *24(E.D.Pa.)(where proper notice that leave was FMLA eligible was not received, summary judgment was appropriate because the plaintiff did not put forth any evidence of injury derived from the defective notice); Coppa v. American Society for Testing Materials, 2005 U.S. Dist. LEXIS 8737, *23 (E.D.Pa. May 11, 2005) (despite the defendant's admission that it designated plaintiff's leave as reduced paid leave "because [they thought]  it[ was] better for [employees] to get paid 60 percent rather than get paid nothing" the court ruled that interference claim failed as a matter of law because plaintiff presented no evidence that of any type of injury or harm.)

[10] In essence, Plaintiff claims that McLean should have terminated Niroda and let him-Plaintiff- assume Niroda's job because Plaintiff commanded a much lower salary than Niroda.

In evaluating employment cases, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose.  Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 525-27 (3d Cir. 1992).   Thus, to establish pretext, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the ... plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer' did not act for [the asserted] nondiscriminatory reasons." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.1994) (internal citations omitted); Romano v. Brown & Williamson Tobacco Corp., 284 N.J.Super. 543, 551 (citing Fuentes, 32 F.3d at 764-65).

## 1. *Prima facie* case of retaliation discrimination

To carry this initial burden in a retaliation case, a plaintiff must show that: (1) he engaged in protected activity (taking FMLA leave); (2) he suffered an adverse employment decision; and (3) the adverse decision was causally related to the leave. Conoshenti, 364 F.3d at 146-47.  The first two elements are not contested; McLean argues only that O'Hare cannot establish the requisite causal connection component.

A causal connection may be established by circumstantial evidence, such as temporal proximity, a pattern of antagonism, and pretext.  Kachmar v. SunGard Dadt Sys., 109 F.3d 173, 177 (3d Cir. 1997).  This indirect evidence is to "be considered with a careful eye to the specific facts and circumstances encountered." Farrell v. Planters

15

Lifesavers Co., 206 F.3d 271, 279, n.5 (3d Cir. 2000). O'Hare claims that there are factual issues related to all three types of circumstantial evidence.

Standing alone, the timing of O'Hare's termination is not necessarily suggestive of improper motive. O'Hare was terminated approximately two months and one week upon his return from medical leave. McLean contends that it was already in the midst of implementing a reduction in force plan.[11] Based upon the chronology of events in the record, the Court finds that the two month time frame is not "unduly suggestive" of an inference of retaliation. Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004)(time frame of two months between the request for an accommodation under the American's With Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq., and subsequent termination not "unduly suggestive" of retaliation); Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003)(time frame of three weeks not "unduly suggestive" of retaliation); see also, Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir.2003) ("Even if timing alone could ever be sufficient to establish a causal link, ... the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.")(internal quotations omitted).

---

[11]An employer is not required to suspend its termination proceedings just because the employee requests medical leave. See, e.g., Clark County Sch. Dist., 532 U.S. at 272. "A contrary holding might impede employers from permissible terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'" Windfelder v. The May Dep't Stores Co., 93 Fed. Appx. 351, 355 (3d Cir. 2004). The record demonstrates that the plant was slow during the period of time that O'Hare was terminated. See, e.g., O'Hare Dep., Ex. C., pp. 110-111 (acknowledging plant was slow at the time of his termination); Charbonneau Dep., Ex. M., p.13-14 (stating layoffs were "evident" and that there was not much business coming in); Gutstein Dep., Ex. O., p. 24 (stating that business fell drastically); Niroda Dep., Ex. L., pp. 25-27 (layoff necessary because the company was slow).

The lack of a temporal proximity suggestive of retaliation is not necessarily dispositive as other evidence may be considered in conjunction with the timing of the adverse action, such as antagonism.  Marasco, 318 F.3d at 513; Farrell, 206 F.3d at 280 ("timing plus other evidence may be an appropriate test where the temporal proximity is not so close as to be 'unduly suggestive.'").   However, the record does not reflect an inference of antagonism.  O'Hare claims that he was met with significant resistance when he attempted to obtain additional leave in January 2008.  Although O'Hare was ultimately permitted to take the leave, he claims that he was required by Besnick to call in and report as sick daily.  In addition, O'Hare was asked to train another co-worker to perform his job upon his return from leave.

This is not the type of antagonism that implies retaliation.  Unlike the antagonism identified in Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993),  O'Hare agrees that he was "not ostracized in the workplace or subject to persistent degrading comments."  Pl. Opp. Br. at 10.  In Robinson, which is cited by O'Hare, the plaintiff was subjected to "[a] constant barrage of written and verbal warnings …, inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge."  Robinson, 982 F.2d at 895.  Based upon that series of events, the Third Circuit upheld the district court's finding of a pattern of antagonism.

 The facts of this case are distinguishable and do not merit a finding of a pattern of antagonism.  O'Hare was permitted to take leave, was paid at least in part, and permitted to return each time to his previous titled position of Shipping Manager.  See, Besnick email, Ex. G.  The mere fact that O'Hare had train a replacement- or a backup-

is not the type of persistent action sufficient to demonstrate or suggest retaliatory motive.  In fact, the record shows that O'Hare trained Vince Niroda because O'Hare's usual backup, Dannette Gudaitus, was reassigned to the new post of assisting Christine O'Connor to achieve ISO certification for the company.  Gudaitus Dep., Ex. H. at pp.52-55; Howarth Dep., Ex. E., at pp. 24-25.

But "these are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." Kachmar v. SunGard Data Sys., Inc. 109 F.3d at 173 177 (3d Cir. 1997).  Considered against the backdrop of the timing and alleged antagonism, O'Hare's pretext arguments are more compelling.  Specifically, the evidence of the timing of O'Hare's selection in the RIF plan coupled with the lack of criteria employed for the selection, is troubling.[12]  Moreover, a heavy majority of the workers included in the RIF have been laid off many times before in what appears to be a trend that tracks the cyclical work shortages during certain periods of the calendar year. All of the employees identified in McLean's chart, depicted supra. at p. 7, have been laid off regularly by the company and called back to their duties when business picked back up: Donna Baron has been laid off thirteen times; Deborah Blake and Edward Omidanski, eight times; Ramona Diaz, at least fourteen times; JoAnne Fleckenstein, nine times; Sandra Rainey, seven times and; Sayana Lokophone, two times. See Exhibits X, Z, BB, Y, AA, CC, and DD, respectively.

These facts undermine McLean's contention of a company RIF as a legitimate

---

[12] The explanation for the criteria was not very specific.  See, e.g., Besnick Dep., Ex. F. at 32 (stating the criteria was "just the amount of work that was going through . . . the department[.]"; Fenkel Dep., Ex. K., pp. 40-41(stating that the criteria used was "how much we needed the people.")

reason to terminate O'Hare.[13] A jury could conclude that the RIF is unworthy of credence because of the fact that the aforementioned regularly laid-off employees comprise a majority of the employees implicated by the RIF at the time that O'Hare's termination was announced.[14]  As a result, even though other managers subsequently became the victim of layoffs and O'Hare himself recognized that the plant was slow at the time he was terminated, O'Hare Dep., Ex. C. at p. 110-111; 123, a genuine issue of fact remains as to whether the RIF is a pretext for discrimination.  Summary judgment as to Count II is denied.

### B. Counts III and IV- Violations of the NJLAD

In Counts III and IV, O'Hare claims he was discriminated against because of his handicap and/or perceived handicap in violation of the NJLAD.  The merits of summary judgment as to these Counts will be considered jointly in light of the common burden of proof.  The NJLAD prohibits employers from discriminating against employees on the basis of a disability or a perceived disability, as defined by the statute.  N.J.S.A. 10:5-4; Andersen v. Exxon Co. U.S.A., 89 N.J. 483, 491-92, 446 A.2d 486 (1982).  Analysis of claims made pursuant to the NJLAD generally follow the analysis of Title VII claims.

---

[13] The record shows that McLean suffered the loss of a marquis account, Bed Bath and Beyond.  Gudaitus Dep., Ex. H., pp. 25-26; Seidenberg Dep., Ex. A., p. 31.  In addition, the fact that McLean purchased new equipment could have been a factor in its economic decline, rather than an indication of profit.  See Seidenberg Dep., Ex. A., p. 31(stating that the cost of new equipment contributed to the large amount of overhead triggering the layoffs).  Thus, there is a genuine issue of fact as to whether the reduction in force was economically motivated or a pretext for am improper retaliatory motive.

[14] For example, Blake was laid off from February 27, 2008 through March 24, 2008, then again between April 9, 2008 through April 21, 2008, and again between April 24, 2008 through July 21, 2008. Ex. Z. Likewise, Rainey was laid off from April 9, 2008 through April 14, 2008, then again from April 21, 2008 through April 22, 2008. Ex. CC.

Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).  Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.  The framework announced in McDonnell Douglas, 411 U.S. 792, governs Title VII claims, and, by extension, claims under the NJLAD.

As previously explained supra., under the McDonnell Douglas burden shifting paradigm, an employee must first establish by a preponderance of the evidence a *prima facie* claim of discriminatory discharge.  For claims arising under the NJLAD, this is established by showing  (1) that Plaintiff was handicapped, (2) that he was otherwise qualified to perform the essential functions of the job, with or without the accommodation by the employer, and was performing at a level that met the employer's expectations, (3) that he nevertheless was fired, and (4) that the employer sought someone to perform the same work after she left.  Muller v. Exxon Research & Eng'g Co., 786 A.2d 143 (N.J. Super. Ct. App. Div. 2001) (citing Clowes v. Terminix Int'l, Inc., 538 A.2d 794 (1988)).

McLean claims that O'Hare was neither handicapped nor perceived as handicapped as defined by the statue.  In the alternative, McLean argues that Plaintiff cannot demonstrate that he was replaced and his NJLAD claims fails on that ground. The Court agrees.

**a. Whether Plaintiff has a recognized disability under the NJLAD**

Pursuant to N.J.S.A. § 10:5-5(q), disability under the NJLAD can come in the form of both physical and non-physical ailments.  The NJLAD defines a "handicapped"

person as one suffering from a "physical disability ... or from any mental, psychological, or developmental disability ... which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N.J.S.A. § 10:5-5(q).  Unlike the ADA's definition, the NJLAD's definition of  "handicapped" is very broad in its scope and the New Jersey Supreme Court directs that the Act be construed liberally. Id. at 590, 538 A.2d 794. However, the NJLAD does not define the specific conditions that fall within its purview. Clowes, 109 N.J. 593.

Here, O'Hare's claims that he had two separate handicaps that meet the NJLAD definition of handicap.  First, O'Hare claims that he was handicapped because he was recovering from diverticulitis and a C.diff infection and was unable to work, relying on Soules v. Mount Holiness Mem. Park, 354 N.J.Super. 569, 573-74 (App.Div. 2002). Second, O'Hare contends that he was seeking treatment for a "mass" in his lung and that because management was aware of the "mass" and ongoing tests, he was perceived as handicapped.

As to Count III, O'Hare's allegations of handicap do not meet the statutory requirements of the NJLAD.  Despite the liberal standard for finding that a plaintiff suffers from a disability, O'Hare fails to point to any physical, or mental, disability that rendered him handicapped under the NJLAD. See Viscik v. Fowler Equipment Co, 173 N.J. 1, 16 (2002)(when a handicap is not readily apparent, expert medical evidence is required).  Plaintiff has not set forth any facts to show that he was handicapped following his return to work after his various periods of leave.  And his reliance on Soules for the proposition that his mere return from a medical leave may render him

21

disabled is unpersuasive.

In Soules, the plaintiff had already been diagnosed with cancer, a recognized handicap under the NJLAD, and was in the midst of undergoing treatment when he was notified of his termination. Id. at 574. Soules was informed that he was terminated due to concerns that he would be unable to perform the functions of his job because of his cancer. Id. The New Jersey Appellate Division reversed a grant of summary judgment, stating that the NJLAD's broad definition of disability encompasses "handicapped or disabled people who do not have a substantial or permanent impairment at the time of the alleged discrimination[.]" Id. (internal citation omitted). The Appellate Court reasoned that this definition encompassed the residual effects of a qualifying disease, even when the disease is no longer present. Id.

The decision in Soules does nothing to alter the conclusion that O'Hare was not disabled. Unlike Soules, O'Hare's medical absences were not due to a recognized NJLAD handicap. Without any support, O'Hare claims that C.diff and diverticulitis are recognized handicaps under the NJLAD. While these conditions certainly necessitated time off, there is no indication from the record that they prevented the normal exercise of bodily and mental functions as is required by the statute. N.J.S.A. 10:5-5(q). Diverticulitis can be a serious medical condition if left untreated, but the record does not indicate that O'Hare's condition caused any lingering or permanent effects. It is undisputed that after every instance of medical leave, O'Hare returned to work with the ability to perform his duties and resumed his position as shipping manager.[15]  Plaintiff

---

[15]On one occasion, he was restricted from operating the forklift and lifting heavy objects, but he eventually reintegrated these tasks to his every day duties. O'Hare Dep., Ex. C. at pp. 94-

agrees that he was able to satisfactorily perform his job duties and that no one expressed any concern or complaints about the manner in which he accomplished his tasks upon returning from any period of medical leave. Id. at pp. 110-111 (admitting Howarth did not treat him differently because of his absences) and 122. For these reasons, Plaintiff's allegations of handicap fail to meet the requirements of the statute.

However, with respect to Count IV, giving Plaintiff every favorable inference, there is a genuine issue of fact as to whether McLean perceived O'Hare to be handicapped. To state a claim for perceived handicap discrimination, Plaintiff must identify facts which demonstrate that McLean perceived him as being handicapped. Andersen, 89 N.J. at 493, 446 A.2d 486; see also, Olson v. General Electric Astrospace, 966 F.Supp. 312, 316 (D.N.J.1997)(The NJLAD protects individuals who are not disabled as defined by the statute but are perceived as being handicapped by their employers.)

O'Hare claims that his statements to management that he was concerned about a mass in his lung and that he was undergoing tests put management on notice that he was suffering from cancer. The record confirms that at least R.J. Howarth was aware that O'Hare was investigating a mass in his lung. See Howarth Dep., Ex. E., p. 20. And Joe Fenkel noticed that O'Hare has lost weight upon his return from a medical absence. Fenkel Dep., Ex. K., pp. 21-24. "The question of whether a Plaintiff is regarded as having such an impairment ... ordinarily is not one to be decided on summary judgment, as it involves a determination of state of mind that is more appropriate for the jury than for

---

96; 122-123.

the judge." <u>Bowers v. National Collegiate Athletic Ass'n,</u> 563 F.Supp.2d 508, 532, n.18 (D.N.J. 2008)(quoting <u>Mues v. General Revenue Corp.,</u> No. 1:05-CV-00505, 2007 WL 2248165, *7 (S.D.Ohio Aug.2, 2007)).

For these reasons, the Court finds that O'Hare's ailment does not meet the definition of disabled under the NJLAD and summary judgment is granted as to Count III. However, there is a genuine issue as to whether McLean perceived O'Hare to be disabled, requiring consideration of the remaining elements of a *prima facie* case of discrimination with respect to Count IV.

**b. Whether O'Hare Was Replaced.**

McLean does not challenge the other *prima facie* elements, arguing only that O'Hare cannot establish the fourth element of his *prima facie* case; that he was replaced or McLean sought someone to perform his job. The evidence in the record demonstrates that Vince Niroda assumed the shipping manager duties upon O'Hare's departure; no one else was hired and Niroda performed these duties in addition to his other duties. <u>See</u> Deposition of Elise Jack ("Jack Dep."), Company Controller, Ex. N., p.16; Besnick Dep., Ex. F. at pp. 37-38. Plaintiff's contention that his position was filled, or that he was replaced by Vince Niroda fails to account for two very important, undisputed facts. First, no one was hired to fill the position vacated by Plaintiff:

> Q. Do you know who, if anybody was hired to replace Mr. O'Hare after he separated from the company?
> A. No one has been hired.
> Q. Do you know if anybody was placed into his position?
> A. I know that one of the other supervisors was covering it on a part-time basis.
> Q. And who was that?
> A. Vince Niroda.

24

Jack Dep., Ex. N., p.16; see also, Gutstein Dep., Ex. P., p. 29 (stating no one was hired to replace O'Hare).

Second, as Plaintiff admitted during oral argument, Vince Niroda's salary did not increase upon his assumption of Plaintiff's shipping manager duties; Niroda came to the position with his salary. There is no evidence that a new shipping manager was named. Instead, the record reflect that the shipping manager duties were consolidated with Niroda's other responsibilities as Assistant Plant Manager and Screening Manager. Moreover, there is no evidence that anyone was hired to assist Niroda with the shipping responsibilities or that anyone was hired to perform some of Niroda's responsibilities as Screening Manager and Assistant Plant Manager.

Therefore, even giving Plaintiff every reasonable inference, Plaintiff is unable to establish the fourth element of a *prima facie* case of discrimination under the NJLAD and summary judgment is granted as to Count III.[16]

### IV. CONCLUSION

For the reasons stated herein and on the record during oral argument, Defendant's Motion for Summary Judgment is denied as to Count II and granted as to Counts I, III, and IV. An appropriate Order will follow.

Dated: September 29, 2009.

/s/ Joseph H. Rodriguez
HON. JOSEPH H. RODRIGUEZ,
United States District Judge

---

[16]Even assuming Plaintiff could establish that he was disabled under the NJLAD, summary judgment would also be granted as to Count III for failure to establish this *prima facie* element.